**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANDRENNA REED,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **EURO MOTORS, doing business as "BMW OF MAINLINE,"** | **NO.  23-3551** |
| **Defendant.** | |

**<u>MEMORANDUM</u>**

**HODGE, J.**                                                                                    **February 12, 2026**

Plaintiff Andrenna Reed ("Reed") asserts claims against her former employer, Euro Motors d/b/a BMW of Mainline ("Euro Motors"), for Title VII of the Civil Rights Act ("Title VII") and § 1981 retaliation (Counts I, IV), race discrimination under Title VII and § 1981 (Counts II, V), and racial harassment under Title VII and § 1981 (Counts III, VI). (ECF No. 7.) Euro Motors has moved for summary judgment on all claims. (ECF No. 30.) For the reasons that follow, Euro Motors' motion is granted in part and denied in part.

## I.    BACKGROUND

### A.    Factual Background[1]

Reed, a Black woman, began working at Euro Motors in July 2022 as an Accounting Clerk. (Statement of Material Facts ("SMF"), ECF No. 30 ¶¶ 1, 2.) As Accounting Clerk, Reed was responsible for bookkeeping and journal entries, among other accounting-related tasks. (*Id.* ¶ 13.) On or about August 19, 2022, Plaintiff was terminated by Joe Serock ("Serock"), General Manager of Euro Motors, because the person who held the position immediately before Reed was returning

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

to Euro Motors. (*Id.* ¶ 15.) The person who held the position immediately before Reed, and who returned to the position after Reed was terminated, is White. (*Id.* ¶ 16.) The day before Euro Motors fired Reed, she spoke to Afroze Khan ("Khan"), the General Sales Manager, who told her she could work in sales. (Counterstatement of Material Facts ("CMF"), ECF No. 33, at ¶ 8.) Reed asserts that Khan told her she was not "fit" to be a Client Advisor in sales, but that she could work in a sales coordinator role. (*Id.* ¶ 9.) Approximately a week after her termination from the role of Accounting Clerk, Reed accepted the new position offered to her as Internet Sales Coordinator. (SMF ¶ 18.) While Reed was employed by Euro Motors, no other employees held this title. (*Id.* ¶ 56; ECF No. 30-2 at 97.) Reed asserts that approximately one month after she started her position as an Internet Sales Coordinator, Khan hired a non-Black woman who had no experience in sales as a Client Advisor. (CMF ¶ 11.)

As Internet Sales Coordinator, Reed was responsible for contacting sales leads to book appointments. (SMF ¶ 20.) Reed earned $15 per hour, a commission of $25 for every customer she spoke to that came into the dealership, and $50 for every customer who purchased a vehicle. (CMF ¶ 15.) Khan was Reed's supervisor in this position. (SMF ¶ 19.) Reed would inform Khan of the customer leads she identified, and he would determine which customer leads would be assigned to a specific Client Advisor. (CMF ¶ 17; SMF ¶ 21.) Reed asserts that she noticed Khan directed her to give customer leads to Client Advisors who were not Black. (CMF ¶ 18.) Reed also asserts that Serock constantly monitored her work, such as reviewing her emails and listening to recordings of phone calls, and he did not engage in the same conduct towards non-Black sales coordinators. (*Id.* ¶¶ 20–22.) Reed further alleges that only the White Client Advisors made complaints about her. (SMF ¶ 30.)

Euro Motors asserts that Reed's thirty-day employee review in October 2022 noted various areas that needed improvement, and her sixty-day review in December 2022 identified unsatisfactory performance by not meeting her monthly objective by fifty percent. (*Id.* ¶¶ 23–24.) Reed asserts that she received feedback on her performance almost every day and believed she was doing a good job, but then Client Advisors began complaining about her. (ECF No. 33 at 18 ¶ 23). Serock met with Reed after her sixty-day review to go over her position responsibilities and offer her tips for improvement.[2] (SMF ¶ 25.) Khan testified that in December 2022, Reed had an "outbreak" in his office and was screaming and yelling. (*Id.* ¶ 26; ECF No. 30-2 at 88.) On December 8, 2022, Reed met with someone in the human resources department at Euro Motors. (CMF ¶ 29.) During that meeting, Reed asserted that "she does not like the way [Khan] spoke to her," and that "[Khan] also said one time three people are prejudiced towards her." (*Id.* ¶ 30; ECF No. 33-2 at 105.) The human resources representative noted that they did not ask who these three people were. (CMF ¶ 31.)

On January 2, 2023, Serock received an email from a White Client Advisor stating complaints about Reed. (SMF ¶ 31; ECF No. 30-2 at 110.) On January 9, 2023, Serock received an email from a Black Client Advisor stating their complaints about Reed. (SMF ¶¶ 29, 33; ECF No. 30-2 at 113.)

In mid-January 2023, Plaintiff was put in the position of Internet Sales Specialist. (SMF ¶ 36.) As with her role as the sole Internet Sales Coordinator, no other employees held the title of Internet Sales Specialist while Reed was employed at Euro Motors. (*Id.* ¶ 56.) Euro Motors asserts that this role realignment was the result of growing complaints from Client Advisors that Reed

---

[2] Reed denies this statement of fact but offers no explanation or evidence in support of the denial. (ECF No. 33 at 18 ¶ 25.) For a non-moving party to create a genuine dispute of material fact, they are required to point to evidence in the record. Fed. R. Civ. P. 56(c).

was unfairly and unequally assigning leads to only certain Client Advisors. (*Id.* ¶ 37.) Reed asserts that she received her largest commission check in January 2023, and when that occurred, Serock changed her position to one where she received $16 an hour, a one dollar increase in her hourly rate from her previous role, but did not receive the $25 commission for each customer that came in. (CMF ¶¶ 32–34.) As Internet Sales Specialist, she continued to receive a $50 commission for each customer who came in and purchased a vehicle where she generated the lead. (*Id.* ¶ 35.) She was no longer responsible for assigning any appointments to Client Advisors. (SMF ¶ 39.)

In late January 2023, Serock questioned Reed about having her personal laptop out and visible on her work desk during working hours. (*Id.* ¶ 42.) Euro Motors' Standard of Conduct policy prohibits "conducting any outside work during paid working time." (*Id.* ¶ 41.) Reed told Serock that she used her laptop during her break for school. (*Id.* ¶ 45.)

In early March 2023, Reed's desk was moved to a different part of the dealership. (*Id.* ¶ 47.) Euro Motors asserts that this occurred with other employees and was not unique to Reed. (*Id.*) Reed asserts that she was seated next to Lou Whitener and Dan Kooperman ("Kooperman"), both of whom openly expressed dislike for Black employees and customers, including Reed. (CMF ¶¶ 41–42.) Reed asserts that Kooperman complained about the fact that he had to sit next to her, and said that if he ever came back to shoot up the place, Reed would be the first person he shot. (*Id.* ¶ 44–45.)

On or about March 21, 2023, Reed was placed on a performance improvement plan ("PIP"). (SMF ¶ 49.) Euro Motors asserts the PIP was the result of another incident in which Reed was screaming and cursing in the vicinity of employees and customers. (*Id.* ¶ 50.) The PIP states that Reed "was approached by a customer who stated they were not comfortable dealing with their [sales consultant] due to a language barrier. [Reed] then reviewed this with a couple other staff

members who directed her to the Sales Manager. [Reed] went to speak to [Khan] but was very aggressive and raising her voice using foul language. [Reed], later was in the showroom screaming and yelling which was witnessed by staff members and customers." (ECF No. 30-2 at 49.) The PIP stated that such behavior will not be tolerated a second time. (*Id.*) A handwritten note at the bottom of the PIP states; "Also addressed her personal computer." (*Id.* at 50.)

On March 25, 2023, Reed filed a written complaint with human resources alleging racial discrimination. (SMF ¶ 51.) Her complaint included the following:

> Instead of me enjoying my Saturday, I'm home stressing about the hostile, racist work environment that I have to look forward to Monday morning. . . . Every time I would get my monthly bonus check, unfortunately, I was written up. Joe would always investigate every customer that's African American. Eventually, I started to notice the pattern. He would tell me, "Oh, this doesn't look good; oh do you know this person? How do they know about the discount on the true car? Are you coaching them". I felt very offended, and now I'm uncomfortable. Once again, my pay was cut, and my new position is the Internet Sales Specialist making $16 an hour.
> . . . I pray this email brings some investigation that'll clean house on the company and make it FAIR. I remember you telling me we can't control who applies for what position, but what about me? I used and got a position in the accounting office. I have a bachelor's degree from the University of Houston and will have my masters from Harvard this summer, but I was "terminated" all because someone wanted their job back. I'm over it, but just stating facts. I also asked if I could be a client advisor, but since I didn't have experience in sales, I was told no. Less than a month later, Jun Li was hired. She has no experience in sales, but she's Afroze Khan's "type of woman," so she got the job.

(CMF ¶ 56.) Euro Motors investigated the complaints and found them to be unsubstantiated. (SMF ¶ 52.) After filing her complaint, Reed asserts she was subjected to worse treatment, such as where she had to park her car, and comments about who she ate lunch with. (*Id.* ¶ 53.) She also alleges that after filing her complaint, she was told by a Client Advisor that another Client Advisor said that Serock stated he could not wait until Reed "gets her Black ass out of here." (*Id.* ¶ 54.)

5

On or about May 1, 2023, Reed was placed on a second PIP. (*Id.* ¶ 55.) Euro Motors asserts she was placed on this PIP due to continued use of her personal computer and for threatening Kooperman. (*Id.*; ECF No. 30-2 at 51.) Reed asserts that after Kooperman almost hit her with a chair when she was pregnant, she said she would smack him if he hit her with the chair. (CMF ¶ 66.) The PIP notes: "This is the third time [Reed] has displayed unprofessional conduct. The second time on 3/21/2023, [Reed] received a PIP. [Reed] has also been reminded verbally, multiple times since April 10, 2023 to stop working on her personal computer." (ECF No. 30-2 at 51.) Reed asserts she asked Serock why she was written up for making that statement to Kooperman when he was not written up for threatening to shoot up the dealership with Reed as his first victim. (CMF ¶ 67.)

Reed left for parental leave on or about May 9, 2023. (SMF ¶ 61.) She is unsure of when she notified Euro Motors of her pregnancy. (*Id.* ¶ 60.) She did not return to work after her parental leave. (*Id.* ¶ 62.) Jean Berney, Payroll Manager, sent Reed a letter on July 13, 2023, stating that they had tried unsuccessfully to reach her regarding her return to work, and sent another letter on August 23, 2023 stating that Euro Motors had been informed she filed for unemployment and were therefore terminating her due to job abandonment. (*Id.* ¶¶ 63–64.)

Reed asserts that during her time at Euro Motors, she observed management treat Black customers differently than non-Black customers. (CMF ¶ 49.) She asserts that Black customers complained to her about being ignored by management, meanwhile when White customers asked to speak with a manager, someone immediately tried to help them with any problems. (*Id.* ¶¶ 50–51.) Reed claims she heard another White Client Advisor say, "I've had colored customers before." (SMF ¶ 49.) When she raised these complaints to Khan, he responded, "Oh, Andrenna, nobody is racist. We're just doing our jobs here." (CMF ¶ 113.) Reed asserts that because of the

discrimination, harassment, and retaliation, she experienced increased blood pressure and complications during her pregnancy that she did not experience during her first pregnancy. (*Id.* ¶ 116–17.)

Another employee of Euro Motor, Michael Robinson, brought an employment discrimination action in September 2023. (*Id.* ¶ 119 ("*Robinson*").) Summary judgment was denied in that case as to race discrimination. *See Robinson v. Euro Motors*, No. 23-3561, 2024 WL 4394737 (E.D. Pa. Oct. 3, 2024). In that case, Reed testified that race played a significant role in how sale leads were distributed, and she disproportionately sent leads to White Client Advisors "because that was the only way [she] was able to keep [her] job." *Id.* at 82 (quoting deposition testimony). She testified that when she gave leads to White Client Advisors, "there were no complaints. I did not get in trouble, I did a good job, my work is phenomenal, it was phenomenal, it was outstanding." (CMF ¶ 78.) But when she gave leads to Black Client Advisors, there was "a discrepancy every time." (*Id.* ¶ 82.)

## B.    Procedural History

On May 24, 2023, Reed filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination, harassment, and retaliation. (ECF No. 7, ¶ 7; ECF No. 8 ¶ 7). The EEOC issued a Right to Sue letter on July 6, 2023. (ECF No. 7 ¶ 8; ECF No. 8 ¶ 8.) Reed filed her complaint in this Court on September 13, 2023. (ECF No. 1.) She filed an amended complaint on November 15, 2023. (ECF No. 7.) Euro Motors moved for summary judgment on all claims. (ECF No. 30.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-movant bears the burden of proof, the movant's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the movant has met its initial burden, the non-movant's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-movant fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

### A. Retaliation

Title VII and § 1981 protect employees who attempt to exercise the rights guaranteed by their respective provisions against retaliation by employers. *See* 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 1981(a); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008). In the absence of direct evidence of retaliation, the Court considers retaliation claims under the familiar burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). *See, e.g.*, *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005).

Under *McDonnell Douglas*, a plaintiff must show the following to establish a prima facie case of retaliation: (1) she engaged in an activity protected by Title VII; (2) the employer took an adverse employment action either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *See Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action. *See Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015). If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (quoting *Marra*, 497 F.3d at 300). If a plaintiff fails to raise a genuine issue of material fact as to any element of the prima facie case, summary judgment in favor of the defendant is warranted, and the Court need not consider the remaining burden shifting analysis of *McDonnell Douglas* framework. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 n.4 (3d Cir. 1999).

The parties agree that Reed's March 25, 2023 complaint of discrimination to human resources constitutes activity protected by Title VII. The remaining question is whether Euro Motors took an adverse employment action on or after the March 25, 2023 complaint, and if there is a causal connection between the protected activity and adverse employment action.

Reed cannot assert that constructive discharge is the adverse employment reaction because she raised this for the first time in her opposition to the summary judgment motion. *See Burgos v. City of Phila.*, 439 F. Supp. 3d 470, 488 n. 86 (E.D. Pa. 2020); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641–42 (3d Cir. 1993). In her Amended Complaint, Reed asserts the following list of adverse actions: "firing Plaintiff from her position in Accounts Payable; removing

Plaintiff from her position of Sales Coordinator and demoting her to a less desirable position; writing Plaintiff up for discipline on two separate occasions for unjustified reasons; and moving Plaintiff's location so she sat next to two White employees who openly disliked Plaintiff people [sic]." (ECF No. 7 at ¶ 70.) Reed was fired from her position as an Accounting Clerk in July 2022, removed from her position as Internet Sales Coordinator in January 2023, received PIPs around March 21, 2023 and May 1, 2023, and had her seating location changed in early March 2023. Thus, only the second PIP occurred after she filed a written complaint with human resources.

Adverse employment actions are those material enough to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & S.F. Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation omitted). Absent actual discharge or refusal to hire, "courts may find unlawful retaliatory conduct 'only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Caver v. City of Trenton*, 420 F.3d 243, 255 (3d Cir. 2005) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1285, 1300 (3d Cir. 1997)). Placement on a PIP is not an adverse employment action absent accompanying changes to employment status, pay, or benefits. *See Reynolds v. Dep't of Army*, 439 F. App'x 150, 153 (3d Cir. 2011). Nothing in the PIP suggests any accompanying changes to employment status, pay, or benefits. (*See* ECF No. 30-2 at 51.) Because no adverse employment actions followed Reed's protected activity, she cannot establish her claim for retaliation, and summary judgment is proper.

**B.      Race Discrimination**

Race discrimination claims are similarly analyzed under the *McDonnell Douglas* framework. *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (applying the *McDonnell Douglas* framework for Title VII claims); *Barnees v.*

*Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 89 (3d Cir. 2015) (applying the *McDonnell Douglas* framework to a § 1981 claim). A plaintiff can establish a prima facie case of employment discrimination by demonstrating that (1) she is a member of a protected class; (2) she was qualified for the position she sought to retain; (3) she suffered from an adverse employment action; and (4) "the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). As before, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The burden then shifts back to the plaintiff to show that the employer's stated reason is pretext for discrimination. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015).

### 1.    Reed's Prima Facie Case

Euro Motors does not challenge Reed's ability to satisfy the first two factors of the prima facie case. Instead, Euro Motors argues that Reed cannot establish an adverse employment action. Reed asserts that the change in her job title from Internet Sales Coordinator to Internet Sales Specialist, which removed the commission she previously received of $25 for every customer she spoke to that came into the store, constitutes an adverse employment action. She further asserts constructive discharge as an adverse employment action. Her constructive discharge claim, raised for the first time at the summary judgment stage, fails for the reasons stated above. However, a reasonable jury could find that her change in job title which also decreased her compensation was an adverse employment action. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411–12 (3d Cir. 1999).

11

Lastly, a plaintiff must establish that the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination. To meet this, a plaintiff "must establish some causal nexus" between their membership in a protected class and the alleged adverse employment decision. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003). The "central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Id.* (internal quotations omitted). Circumstances giving rise to an inference of discrimination include derogatory or negative remarks, more favorable treatment to a similarly situated employee, or replacing the plaintiff with an individual not in their protected class. *See May v. PNC Bank*, 434 F. Supp. 3d 284, 296 (E.D. Pa. 2020).

Reed asserts various facts regarding the treatment of Black employees and customers by management at Euro Motors to show an overall culture of racial animus. For instance, Reed asserts Khan told her she was not "fit" to be a Client Advisor and subsequently hired a non-Black woman with no sales experience as a Client Advisor. As Internet Sales Coordinator, Reed asserts that Khan directed her to give leads to Client Advisors who were not Black. She further asserts that she was told not to give leads to one of the Black Client Advisors at all. She asserts Serock constantly monitored her work and did not monitor non-Black sales coordinators in the same way. These facts that Reed offers in opposition to summary judgment are supported from her own testimony, either through deposition in this case or the *Robinson* case, or in her interrogatory responses. (*See generally* ECF No. 33.)

Euro Motors disputes these assertions on the basis that she relies solely on her own self-serving testimony and no other evidence. While "[a] plaintiff's subjective belief that race played a role in an employment decision is not sufficient to establish an inference of discrimination,"

*Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x 152, 153 (3d Cir. 2013), "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990). In *Sarullo v. United States Postal Services*, the Third Circuit found the plaintiff could not establish an inference of discriminatory animus where the only evidence of race discrimination consists of his own assertion that he was not rehired because he was Native American, and the defendant was unaware that the plaintiff was Native American. 352 F.3d at 798. That is the type of self-serving testimony that is insufficient to establish an inference of discrimination. But here, Reed articulates several instances of differential treatment of Black employees and racial animosity at Defendant, which a reasonable juror could find give rise to an inference of unlawful discrimination. Reed therefore has established a prima facie case of race discrimination.

### 2.      Justification and Pretext

The burden then shifts to Euro Motors to articulate a legitimate, non-discriminatory basis for the adverse employment action. Euro Motors asserts that Reed was moved into the Internet Sales Associate position because it received numerous complaints from Client Advisors about Reed improperly distributing leads. Plaintiff testified that Client Advisors complained about her lead distributions "every single day." (ECF No. 30-2 at 22–23.)

While "[w]orkplace performance issues may constitute a legitimate, non-discriminatory reason for an employee to be subject to an adverse employment action." *Varughese v. City of Allentown*, 5:23-cv-3804, 2024 WL 4655419, at *7 (E.D. Pa. Nov. 1, 2024), there are disputes of fact regarding Reed's distribution of leads to Client Advisors. Euro Motors received emails in early January from both a Black and a White Client Advisor regarding issues with Reed's

performance.[3] On the other hand, Reed testified that she faced issues when giving leads to Black

Client Advisors but not White Client Advisors. Thus, while Euro Motors presents a justification,

this Court must look at the facts in a light most favorable to Reed. A reasonable juror could

determine that such justification was pretextual.

### C.    Racial Harassment

To establish a hostile work environment claim, Reed must prove (1) she suffered

intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3)

the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a

reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability. *See*

*Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (applying these factors to a

Title VII claim); *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (applying these factors

to a § 1981 claim). Euro Motors argues that summary judgment is proper because Reed has not

presented any facts to satisfy the "severe or pervasive" element. Euro Motors does not challenge

Reed's ability to satisfy any of the other factors.

Conduct is severe or pervasive depending on "the frequency of the discriminatory conduct;

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." *Castleberry*, 863 F.3d

at 264 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[T]he advent of more

sophisticated and subtle forms of discrimination requires that [the Court] analyze the aggregate

---

[3] Reed properly asserts that the contents of these emails are hearsay, which can only be considered on a motion for summary judgment if they are capable of admission at trial. *Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 223 n.2 (3d Cir. 2000). But the emails can properly be considered for the impact they have on decisions made by Euro Motors without considering the truth of the matter asserted in the emails. *See United States v. Graham*, 486 F. App'x 265, 269 (3d Cir. 2012).

effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Sherrod v. Phila. Gas Works*, 57 F. App'x 68, 76 (3d Cir. 2003) (quoting *Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir. 2001)). To establish a hostile work environment, the conduct must be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *See Harris*, 510 U.S. at 21.

Reed lists fourteen specific instances of discriminatory conduct:

1. Defendant fired Plaintiff and rehired a White woman (CMF ¶¶ 2–3)

2. Defendant refused to allow Plaintiff to work as a car saleswoman because of her lack of experience but then allowed a non-Black woman with no sales experience to work in that position (CMF ¶¶ 9–10)

3. Serock treated Black employees less favorably than non-Black employees (CMF ¶¶ 23–25)

4. Khan treated Black employees less favorably than non-Black employees (CMF ¶¶ 13–22)

5. Serock and Khan treated Black customers less favorably than non-Black customers (CMF ¶¶ 23–25, 49–53)

6. Serock and Khan complained when Plaintiff gave leads to Black client advisors (CMF ¶¶ 85–101)

7. Serock and Khan did not question Plaintiff when she gave leads to non-Black client advisors (CMF ¶¶ 102–107)

8. Khan specifically told Plaintiff not to give leads to a Black client advisor, Robinson (CMF ¶¶ 108–115)

9. Khan told Plaintiff three employees did not like her because of her race (CMF ¶¶ 29–31)

10. Serock stated he wanted to get Plaintiff's "Black ass" out of the job (CMF ¶¶ 68–69)

11. Kooperman complained that he had to sit next to Plaintiff, threatened to shoot Plaintiff and when another employee suggested Plaintiff ask him for help, Kooperman stated, "Don't ask me shit" (CMF ¶¶ 43–48)

12. When Plaintiff complained about race discrimination, Defendant did nothing to correct the environment (CMF ¶¶ 54–58)

15

13. Khan told Plaintiff employees who complained to HR were "weak" (CMF ¶ 59)

14. After Plaintiff complained about discrimination, Defendant wrote Plaintiff up for a comment she made to Kooperman, despite the fact he threatened to shoot her and was never disciplined (CMF ¶¶ 61–67)

(ECF No. 33-1 at 8–9.)

The present case differs from much of the case law on this issue as it lacks racially charged comments that are present in other cases. *See, e.g.*, *Samuel v. Target Realty, LLC*, No. CV 19-2203, 2021 WL 4774858, at \*15 (E.D. Pa. Oct. 13, 2021) (involving comments such as a coworker's use of the n-word, comments that "Black people love chicken," a supervisor stating he would not rent an apartment to plaintiff because she's not turning this "into the hood or the ghetto," and management's failure to remove a monkey that plaintiff found hanging from the ceiling of an apartment that he was expected to clean). Serock's alleged statement of wanting to get Reed's "Black ass" out of the job is racially charged, but it is inadmissible hearsay. Reed has not identified any comparable case law supporting that the conduct she alleges is severe or pervasive.

Viewing the facts in light most favorable to Reed, she cannot establish that the discriminatory conduct was physically threatening or humiliating. Kooperman's comment threatening to shoot Reed is facially neutral, and only Reed's testimony supports that Kooperman did not like Reed because of her race. Instead, this case is similar to *Sherrod*. In that case, the African American plaintiff was told by her supervisor that "he didn't like the way [two African American employees plaintiff supervised] were eating at their desks, it must be their culture." 57 F. App'x at 71. The supervisor told the plaintiff that if those two employees "don't do their work, I'm going to sit at their desks with a whip." *Id.* Plaintiff was told not to attend a meeting even though her presentation was on the agenda. *Id.* at 76. Her supervisor told another person in the department: "don't do nothing [plaintiff] tells you to do." *Id.* at 71. Additionally, the plaintiff

16

asserted that other members of the management team would treat her badly and scream at her. *Id.* at 76.

The *Sherrod* court determined that the "culture" and "whip" comments coupled with facially neutral mistreatment of the plaintiff could raise an inference of racial discrimination. *Id.* at 76. However, the court concluded that this was insufficient to establish that the behavior was severe or pervasive enough to establish a hostile work environment because "there is no evidence that anyone ever referred to [plaintiff] using racial slurs. The statements which [plaintiff] considered offensive were subject to non-racial interpretation and were not physically threatening or humiliating." *Id.* at 77. Similarly, here Reed raised an inference of racial discrimination. However, the evidence is insufficient to establish that the discrimination was severe or pervasive. She therefore cannot establish her hostile work environment claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of Defendant as to retaliation (Counts I and IV) and racial harassment (Counts III and VI). The Court denies summary judgment on the remaining claims. An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

 

**HODGE, KELLEY B., J.**